HOWARD, Chief Judge.
In this toxic tort case, we previously considered the admissibility of testimony from the plaintiffs’ general causation expert. At issue in the present appeal is whether the district court abused its discretion in excluding the testimony of the plaintiffs’ specific causation expert. We conclude that the district court’s ruling was a supportable exercise of its discretion, and we therefore affirm the grant of *471 summary judgment to. the defendant following that evidentiary ruling.
I.
Background
Brian Milward worked as a pipefitter and refrigerator technician for over thirty years. During the course of his .employment, Milward was exposed to varying levels of benzene from paints and other products manufactured by (among others) Rust-Oleum Corporation. In 2004, he was diagnosed with Acute Promyelocytic Leukemia (“APL”). Three years, later, Mil-ward and his spouse sued a number of defendants on the theory that their negligence caused Milward’s disease. The only remaining defendant is Rust-Oleum.
To succeed against Rust-Oleum, the Milwards had the burden of establishing, through expert testimony, general and specific causation. In other words, they needed to show that exposure to benzene can cause APL (general causation), and that exposure to benzene was, in fact, a substantial factor in the development of Brian’s APL (specific causation). The district court bifurcated the proceedings; it planned first to address the admissibility of expert testimony on general causation, and then to consider the specific causation issue.
In a 2009 ruling, the district court excluded the Milwards’ general causation expert. Accordingly, it entered judgment in favor of the defendants without proceeding to the .second, phase of the case. The. Mil-wards appealed that decision and, for reasons specific to their general causation expert, we reversed. See Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11 (1st Cir.2011). We remanded the case to the district court to proceed to the specific causation question.
Under the supervision of a different district court judge, the parties engaged in discovery on the subject of specific causation. Relevant here, the Milwards retained occupational medicine physician Dr. Sheila Butler to serve as their expert witness.[1] The admissibility of her opinion testimony is at the heart of this appeal, and thus additional background on her opinion is in order.
Dr. Butler
Dr. Butler, an employee of the Veterans Administration, specializes in clinical assessments of environmental and occupational exposure in combat-exposed veterans. In her proposed testimony, Dr. Butler presented three theories.
First, she testified that although benzene is naturally occurring, there is no safe level of benzene exposure. This was her predominant theory, and she consistently reiterated her hypothesis. She emphasized that she reached this conclusion by examining “the biology, the pathophy-siology, what the substance does to the person and the disease process.” And, she noted, she was able to do so without, relying on any of.-the relevant epidemiological studies. Given this no-safe level theory, *472 Dr. Butler maintained- that Milward’s exposure (as detailed by Dr. Stewart) was likely the 'cause of his APL. The district court rejected this hypothesis because it could not be properly tested with any known rate of error. The Milwards do not meaningfully challenge the district court’s conclusion on appeal. Accordingly, we assume that the ruling was correct and bypass further discussion of the issue. See Mills v. U.S. Bank, NA, 753 F.3d 47, 55 (1st Cir.2014).
Second, Dr, Butler rather cursorily, concluded that even beyond the no-safe level hypothesis, certain epidemiological studies have established that an individual’s “relative risk” of developing APL increases when exposed to specified amounts of benzene. She then compared Milward’s exposure levels to those that had been found to be dangerous in that research. Since Mil-ward’s exposure was higher than the amounts found to be hazardous, Dr. Butler reasoned that benzene exposure was likely the cause of his APL. Notably, she did not explain why she chose the studies on which she relied, nor did she address any study with contrary findings. In fact, during Dr. Butler’s deposition, defendant’s counsel asked her a number of questions about her ability and willingness to engage with the relevant epidemiological research. For instance, counsel asked, “Are you aware of any studies which find .that there is- no relationship between benzene exposure and APL,” to which she answered “Yes .... the literature [ ] has support for both.” Counsel then asked, “Do you intend in this case to weigh the different epidemiological studies and offer an opinion as to which ones we should rely on and which ones we should discount,” to which she replied, “No.”
Finally, Dr. Butler engaged in a “differential diagnosis” to conclude that benzene exposure likely caused Milward’s APL. Through this method (essentially a process of elimination) Dr. Butler “ruled out” some of the more common factors associated with APL, among them obesity and smoking. She then determined that since benzene exposure was a potential cause, she could also “rule but” an idiopathic diagnosis (or, a diagnosis without a known cause). Thus, since benzéne exposure was the only significant potential cause remaining, she concluded that it was likely’ thé culprit.
Procedural History
Back in court, Rust-Oleum moved both to exclude Dr. Butler’s testimony and for summary judgment. The district court evaluated, and rejected, each of the theories that Dr.'Butler put forward to establish specific causation. For reasons discussed below, the judge ultimately ruled that Dr. Butler’s testimony was inadmissible under Federal Rule of Evidence 702’. Since the Milwards could not establish specific causation without Dr. Butler’s testimony, the district court granted summary judgment in favor of Rust-Oleum. Fed. R.Civ.P. 56. This timely appeal followed.
II.
We review the district court’s decision to admit or exclude expert testimony for abuse of discretion. See United States v. Shay, 57 F.3d 126, 132 (1st Cir.1995) (noting that we will only “reverse a decision ... if (1) the district court based the decision on an incorrect legal standard ... or (2) we have a definite and firm conviction that the court made a clear error of judgment — ”). Predicate factual findings aré reviewed for clear error, while pure questions of law engender ,de novo review. Milward, 639 F.3d at 13-14. As for the district court’s ultimate decision to grant Rush-Oleum summary judgment, because the Milwards are proceeding under state-law theories of liability, wé apply
*473 Massachusetts law, see Philibotte v. Nisource Corp. Servs. Co., 793 F.3d 159, 165 (1st Cir.2015), and review the decision de novo, see Samaan v. St. Joseph Hosp., 670 F.3d 21, 38 (1st Cir.2012).
 As in the district court, our admissibility inquiry is guided by Federal Rule of Evidence 702, which provides that:
A witness who is qualified as an expért by knowledge, skill, experience," training, or education may testify in the form of an opinion or otherwise if:
(a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence
• or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.
Fed.R.Evid. 702. In applying Rule 702, the district court serves as the gatekeeper for expert testimony by “ensuring that [it] ... both rests ort a reliable foundation and is relevant to the task at hand.” Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance. See id. at 593 n. 10, 113 S.Ct. 2786; see also Fed.R.Evid. 702, advisory committee’s note.
As noted above, the district court rejected each theory that Dr. Butler put forward to establish specific causation. We now focus on the two theories that the Mil-wards press on appeal: Dr. Butler’s relative risk conclusion and her differential diagnosis.[2]
Relative Risk
The district court rejected Dr. Butler’s relative risk testimony because she had expressly disavowed her intent, and minimized her ability, to analyze conflicting" epidemiological studies. The district court reasoned that without such analysis, it was impossible to ensure that the studies she cited were actually based on a reliable methodology. The Milwards challenge this decision in three ways.
First, they assert that in rejecting the testimony, the district court relied on an incorrect premise: that conflicting epidemiological studies existed. They note that there .were studies establishing an increased risk of APL after a certain level of exposure, such as 8 ppm-years. See, e.g., Deborah C. Glass et al., The Health Watch Case — Control Study of Leukemia and Benzene, 1076 Ann. N.Y. Acad. Sci. 80, 85 (2006); Richard B. Hayes et al., Benzene and Lymphohematopoietic Malignancies in Humans, 40 Am. J. Indus. Med. 117, 120. The Milwards also acknowledge that other studies found no. increased risk of leukemia with exposure at any level less than 4(3 ppm-years. See, e.g., Robert A. Rinsky et al., Benzene and Leukemia: An *474 Epidemiologic Risk Assessment, 316 New England J. Med. 1044 (1987), They argue, however, that since the Rinsky study did not affirmatively find the absence of a relationship, the studies were not actually in conflict.
While it is certainly true that, at least in some cases, the “absence of evidence” is not the same as “evidence of absence,” it is not similarly true that the studies must present diametrically opposing conclusions to be in tension with one another. Here, a number of studies have been identified that show a correlation between APL and benzene exposure at a specific level, while other studies do not show that correlation. In order to establish specific causation by the relative risk method, Dr. Butler was required to choose a study, or studies, to serve as a baseline to which she could then compare Brian Milward’s case. There can be no serious question that choosing a study that showed a correlation above a specific level (e.g., the 8 ppm-years in the Glass study), rather than one that did not exhibit any such correlation (e.g., the 40 ppm-years in the Rinsky study), yields a vastly different comparison. The district court did not clearly err in finding that the studies were sufficiently distinct from one another such that utilizing one, rather than another, would necessarily lead to different testimony.
The Milwards next argue, albeit summarily, that Dr. Butler did not actually disavow her willingness to consider the divergent studies. Instead, they allege that the district court took her statements out of context.
We make quick work of this argument given the clarity of the record. Dr. Butler anchored her testimony to her no-safe threshold hypothesis, a theory that did not turn on the validity of any of the epidemiological studies. Indeed, given that she acknowledged that she based that theory on “the biology, the pathophysiology, [and] what the substance does to the person and the disease process,” it was consistent for her to then state that she had neither the need nor the intent to compare the competing epidemiological literature.[3] There was no error in the district court’s decision to give her statements their plain meaning.
Finally, the Milwards argue that even if the district court did not err in these respects, Dr. Butler’s testimony was nevertheless still based on reliable evidence, and it was therefore admissible. In support of this contention, the Milwards defend the studies that Dr. Butler invoked in her testimony. They also cite Schultz v. Akzo Nobel Paints, LLC, 721 F.3d 426 (7th Cir.2013), which they maintain is closely analogous to this case.
Generally, where an expert’s medical opinion is grounded exclusively on scientific literature, a district court acts within its discretion to require the expert to explain why she relied on the studies that she did and, similarly, why she disregarded other, incompatible research. See, e.g., Kuhn v. Wyeth, Inc., 686 F.3d 618, 623-24 & 633 (8th Cir.2012) (permitting testimony where the expert witness relied on methodologically reliable studies and provided an explanation for why those studies were chosen); Norris v. Baxter Healthcare Corp., 397 F.3d 878, 886 (10th Cir.2005) (noting in the context of a general causation finding that the expert witness’s inability to address contrary views made the opinion unreliable). It is self- *475 evident that, when an expert engages in a relative risk analysis in the manner that Dr. Butler did here, the district court is on firm ground in requiring such an explanation, since the validity- of the approach depends on the reliability of the studies chosen. See 3 Mod. Sci. Evidence § 23:27 (2014-2015 Ed.) (discussing the use of the relative risk approach in establishing specific causation). That is, if the expert is comparing the plaintiffs condition to a study, and the study is based on an unreliable methodology, then the comparison itself is futile.
Schultz, the case on which the Milwards rely, is consistent with this view. In that case, the Seventh Circuit reversed a district court’s decision to exclude specific causation expert testimony about an individual’s exposure level to benzene. 721 F.3d at 428. The Seventh Circuit found that the testimony was reliable because the expert “focused specifically on the amount of benzene to which [the plaintiff] had been exposed and related this -amount to the scientific literature.” Id. at 432. Importantly, the expert in Schultz did not simply point to favorable studies showing an increased risk of leukemia at low levels of exposure. Instead, the expert in that case explained why he believed that a conflicting study was unreliable and why, based on his knowledge of the literature, he chose to rely on the studies that he did. Id. at 432-33.
Here, the relevant studies-were not only in tension with one another, but expressly cast each other into doubt. See, e.g., EPA Office of Research and Development, Carcinogenic Effects of Benzene: An Update, at 14 (April 1998). Given that, the district court reasonably ruled that there needed to be some indication of why Dr. Butler utilized the studies that she did. Indeed, her complete unwillingness to engage with the conflicting studies (irrespective of whether she Was able to or not) made it impossible for the district court to ensure that her opinion was actually based on scientifically reliable evidence and, correspondingly, that it comported with Rule 702. Not only does this render this case readily distinguishable from Schultz, but it also justifies the district court’s decision.[4]
Differential Diagnosis
The district court also rejected Dr. Butler’s “differential diagnosis.” ' Although the judge did not question Dr. Butler’s decision' to “rule out” obesity and smoking as causes of Brian Milward’s APL, the court was concerned about the utility of the approach given the high percentage of APL cases that are idiopathic (according to the record, roughly 70-80% of all APL diagnoses). The judge also stated that Dr. Butler’s reasoning was circular; she “ruled out” an idiopathic APL by “ruling in” benzene as a cause, but she had failed to provide a scientifically reliable method of “ruling in” benzene in the first instance. The Milwards contend that in making this ■ decision, the district court ignored our case law that has blessed an expert’s use of a differential diagnosis to establish causation,
*476 Even if the Milwards’ scanty argument in their opening brief were sufficiently developed as to avoid a waiver finding, see United States v. Oladosu, 744 F.3d 36, 39 (1st Cir.2014) (“[b]ecause the argument is underdeveloped, it is waived”), we nonetheless see no abuse of discretion in the district court’s decision. The Milwards are certainly correct that a “differential diagnosis” can be a “reliable method of medical diagnosis.” Milward, 639 F.3d at 18; see also Granfield v. CSX Transp., Inc., 597 F.3d 474, 486 (1st Cir.2010). But, they still must show that the steps taken as part of that analysis — the “ruling out” and the “ruling in” of causes — were accomplished utilizing scientifically valid methods. See Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 254 (2d Cir.2005).
Since Dr. Butler was only able to “rule out” an idiopathic APL because she had “ruled in” benzene as a cause, the validity of her differential diagnosis turns on the reliability of that latter conclusion. See Ruggiero, 424 F.3d at 254 (noting that an expert must use reliable scientific methods to “rule in” causes); see also Best v. Lowe’s Home Ctrs., Inc., 563 F.3d 171, 179 (6th Cir.2009); Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir.2001). Indeed, the reliability of that decision is particularly critical here given the extensive number of APL cases that are idiopathic. Under such circumstances, eliminating a number of potential causes— without properly and explicitly “ruling in” a cause — is simply “of little assistance.” Restatement (Third) -of Torts; Phys. & Emot. Harm § 28, cmt. c(4)(2010).
Dr. Butler appears to have “ruled in” benzene exposure solely by relying on' her two other theories. But, as explained above, the district court found both of these theories to be unreliable. As we agree with the district court’s conclusion regarding the relative- risk methodology, and since the Milwards have not challenged the district court’s no-safe threshold determination, they have failed to show how Dr. Butler could have reliably utilized either method to “rule in” benzene exposure. Nor, we note, have they pointed to other evidence in the record that Dr. Butler could have conceivably used to “rule in” benzene.
Given that the record does not contain a scientifically reliable basis to “rule in” benzene, Dr. Butler needed some other method to “rule out” an idiopathic diagnosis. She did not provide one. As such, the district court acted within its discretion to conclude.that the extraordinary number of idiopathic APL cases, coupled with the lack of a rehable means to rule out an idiopathic diagnosis here, muted Dr. Butler’s ability to reliably apply this methodology.[5]
III.
Once the district court excluded Dr. Butler’s testimony,' it then correctly granted Rust-Oleum’s motion for summary judgment. As is well-established under Massachusetts law, “expert testimony is required to establish medical causation.” Reckis v. Johnson & Johnson, 28 N.E.3d 445, 461 (Mass.2015). This applies to both general and specific causation. Id. at 461 n. 33. Without any other medical expert evidence in the record probative on specific causation, judgment as a matter of law was necessarily required. Fed.R.Civ.P. 56.
*477 Accordingly, we affirm the district court’s decision to exclude- Dr. Butler’s testimony and its concomitant grant of summary judgment in favor of Rust-Olp-um.

. The Milwards broadly allege that the district court applied the wrong legal standard when evaluating Dr. Butler’s fitness to serve as an expert witness. They note that the court “held that Dr. Butler is unqualified because she cannot ‘evaluate the relevant studies’ with the ‘rigor’ of an epidemiologist.” This argument misconstrues the district court’s action. The court did not, in a vacuum, conclude that Dr. Butler was unqualified to provide expert testimony in this case because she was not an epidemiologist. Instead, the court stated that since Dr. Butler was unwilling to provide testimony respecting the epidemiological literature in the context of the "relative risk” approach, the Milwards could not rely on that method to prove specific causation. While we provide more detail about that conclusion below, it suffices here to say that the district court did not err as the Milwards allege.

. Likewise, in discussing the statistical significance of the reports, Dr. Butler seemingly minimized her ability to analyze the studies when she said "and I’m not an epidemiologist if you’re going to go there. I’m just saying that to me that’s fairly — that’s fairly significant.”

. We also note that the Milwards’ position yields a further problem. Absent Dr. Butler’s testimony weighing the studies, the only support for their reliability is the fact that they were peer-reviewed, published works. As we have noted though, "an article does not reach the dignity of a ‘reliable authority’, merely because some editor, even a most reputable one, sees fit to circulate it ... [and] [m]ere • publication cannot make them automatically reliable authority.” Meschino v. N. Am. Drager, Inc., 841 F.2d 429, 434 (1st Cir.1988). Given the need for some evidence establishing the reliability of the studies invoked, the court likewise did not err in refusing to take judicial notice of their reliability.

. In their brief, the Milwards also argue that Dr. Butler’s position on specific causation is . consistent with the latency period in -Brian Milward’s case. The district court did not rest its decision on that proposition (instead, it just noted a concern about the issue), and we therefore need not reach the argument.